[Docket No. 9]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

NATALIE CAMPAGNA and GLORIA
DEVAULT, et al., on behalf of themselves
and all others similarly situated,

         Plaintiffs,

      v.

TD BANK, N.A.,

         Defendant.

No. 20-18533 (RMB/SAK)

**OPINION**

**APPEARANCES**

Richard M. Golomb and Kenneth J. Grunfeld
Golomb & Honik, P.C.
1835 Market Street, Suite 2900
Philadelphia, Pennsylvania 19103

    *On behalf of Plaintiffs*

Margaret Mary Doyle and Susan M. Leming
Brown & Connery, LLP
3600 Haddon Avenue
Westmont, New Jersey 08108

    *On behalf of Defendant*

**RENÉE MARIE BUMB, United States District Judge**

        This matter comes before the Court upon the Motion to Dismiss filed by Defendant

TD Bank, N.A. ("TD Bank"). [Docket No. 9.] Defendant's Motion seeks dismissal of

Plaintiffs'[1] Amended Complaint in its entirety. [Id.] For the reasons set forth herein,

Defendant's Motion to Dismiss will be denied.

## I.     FACTUAL BACKGROUND

Between approximately 2016 and 2019, Plaintiffs in this matter applied for and

received secured credit cards from TD Bank. [See Docket No. 10, ¶¶ 35, 46, 57, 65, 73.] A

secured card is a type of credit card that requires the cardholder to provide a security deposit

in the amount of the credit line. [See id., ¶ 3.] The security deposit is used to "secure" the

credit line and cannot be accessed by the consumer as long as the secured card account is

open. [Id., ¶¶ 3, 6.] A ten-page form contract (the "Agreement") governs the use of the

secured cards. [Id., ¶ 20.] Section 3(C) of the Agreement addresses the aspect of the secured

cards at issue here: the "graduation" to an unsecured credit card. [See id., ¶ 22.] When a

holder of a secured card (the "cardholder") "graduates," TD Bank returns their security

deposit to them, and they receive a prorated refund of the secured credit card's annual fee.

[Id., ¶ 7.] They may also receive a "boost" to their credit score based on changes reported by

TD Bank to the credit reporting agencies. [Id.]

> Section 3(C) of the Agreement states in its entirety:
>
> If you use and maintain a Credit Card Account for 7 consecutive Billing
> Cycles without committing and act of default pursuant to the Agreement, you
> may be eligible to graduate to an unsecured TD Bank credit card
> automatically. This means that your savings account that secured the credit

---

[1] Natalie Campagna, Gloria DeVault, Amanda Farmer, Philip Pagliaro, and Yaakov
Roziner are the Named Plaintiffs in this matter, which is a putative class action. [See
Docket No. 10.]

card will be released so you will have access to these funds. Upon graduation, a prorated refund of the annual fee will be given to you and it will appear on a subsequent monthly statement. Your credit limit and your APR will remain the same. Your account will automatically be reviewed once you meet the threshold eligibility requirements. If you are not graduated at your first review, your account will automatically be reviewed on an ongoing basis thereafter to determine if you have become eligible for an unsecured account. If you meet the requirements you will be notified of the impending automatic graduation. All other terms and conditions remain the same.

[Docket No. 10-1, at 2, § 3(C).]

Each Named Plaintiff alleges that they maintained their secured cards for at least seven months without committing an act of default. [See Docket No. 10, ¶¶ 29–81.] Nevertheless, they were never graduated to an unsecured card. [See id.] In fact, some were allegedly informed that the graduation process is not, in fact, automatically undertaken by TD Bank after seven months, despite the language in the Agreement. [See id., ¶¶ 40–41.] Moreover, a TD Bank customer service specialist allegedly told one Named Plaintiff that "hardly anyone ever graduates due to the lengthy process involving many outside factors." [Id., ¶ 41.] Indeed, as of the filing of the Amended Complaint, Named Plaintiffs allege that they have not been graduated, despite maintaining their secured cards without committing an act of default for between approximately fifteen and thirty-seven months.[2] [See id., ¶¶ 29–81.]

---

[2] According to the Amended Complaint, TD Bank only gave one Named Plaintiff—Yaakov Roziner—a reason for not graduating him. [See id., ¶ 79.] Specifically, the Amended Complaint alleges that TD Bank told Roziner that he had a late payment, which Roziner claims to be "a complete falsehood." [Id.]

3

Meanwhile, one Named Plaintiff alleges that TD Bank customer service representatives would, upon notifying her that she did not qualify to graduate, propose that she separately attempt to open an unsecured card and request a larger line of credit. [Id., ¶¶ 48, 51.] The Amended Complaint also alleges that one cardholder was told by a TD Bank customer service representative "that the review period for promotion to an unsecured account took place after **two years**," as opposed to seven months. [Id., ¶ 85 (emphasis in original).] This, the Amended Complaint alleges, "is spelled out in a much less prominent location on [TD] Bank's website," which "invites consumers who **already** have a TD Secured Credit Card to apply for an unsecured credit card." [Id., ¶ 87 (citing TD Bank's website) (emphasis in original).] That portion of TD Bank's website allegedly states:

> Upon receipt of your application, we will review your TD Secured Credit Card account to ensure it has been open and in good standing for at least 24 consecutive billing cycles. We will then review your application in its entirety to determine your creditworthiness in accordance with our standard procedures for review of unsecured personal credit card applications, including, but not limited to, obtaining a credit report to determine your eligibility.

[Id. (citing TD Bank's website).] Plaintiffs allege that this language "is aimed at consumers who already have TD Secured Credit Cards, but want to apply for an unsecured credit card," which means that "it is not geared toward those applying for the card initially." [Id., ¶ 88.] Moreover, Plaintiffs allege that the website language indicates a "classic bait-and-switch scheme" because it contains requirements that "are dramatically different than the criteria set forth in the . . . Agreement for graduation to an unsecured credit card," including

4

a two-year rather than seven-month waiting period and the requirement to obtain a credit report. [Id., ¶ 89.]

Finally, Plaintiffs allege that "[t]his practice is not new." [Id., ¶ 83.] They point to comments made in 2013 on an online forum by a user called "@taxi818." [Id.] The user complained that, despite initially being "advised that he could graduate to a[n un]secured card after six months of" using a secured card, he was told after the sixth month that "the review period for promotion to an unsecured account took place after **two years** rather than what was stated in the contract." [See id., ¶¶ 83–85 (emphasis in original).] Defendant notes that other comments left on the same forum contradict @taxi818's supposed experience. [See Docket No. 9-1, at 15–16.]

## II.     PROCEDURAL HISTORY

Plaintiffs filed this suit on December 8, 2020. [Docket No. 1.] Defendant timely filed the present Motion to Dismiss on January 19, 2021. [Docket No. 9.] Plaintiffs responded by timely filing the Amended Complaint on January 22, 2021. [Docket No. 10.] The Amended Complaint alleges five Counts.[3] Count I alleges Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing, on behalf of the National Class. [Id., ¶¶ 103–15.] Count II alleges Violation of Delaware's Consumer Fraud Act, 6 DEL. C. §§ 2511–27 (the "DCFA"), on behalf of the National Class. [Id., ¶¶ 116–26.] Count III alleges a violation of

---

[3] The Amended Complaint also alleges one National Class and three Subclasses: the New York, New Jersey, and Connecticut Subclasses. [Id., ¶¶ 92–102.]

the New York General Business Law, N.Y. GEN. BUS. LAW § 349, et seq. ("Section 349"),

on behalf of the New York Plaintiffs and Subclass. [Id., ¶¶ 127–41.] Count IV alleges

violations of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq., ("NJCFA"),

on behalf of the New Jersey Plaintiff and Subclass. [Id., ¶¶ 142–50.] Finally, Count V alleges

violations of the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a, et

seq., ("CUTPA"), on behalf of the Connecticut Plaintiff and Subclass. [Id., ¶¶ 151–59.]

On January 22, 2021, the Court issued an Order that, among other things, required

Defendant to either supplement its Motion to Dismiss or indicate that it would rest on the

Motion as previously filed. [Docket No. 12.] Before Defendant responded to that Order,

Plaintiffs filed their response to the Motion, arguing that it was moot, given the filing of the

Amended Complaint. [Docket No. 14.] Nevertheless, Defendant filed its supplemental brief

on February 10, 2021. [Docket No. 20.] The parties later agreed to a briefing schedule that

permitted Plaintiffs the opportunity to fully address the arguments raised in Defendant's

Motion. [See Docket No. 25.] Thereafter, Plaintiffs filed their Response in Opposition on

March 8, 2021. [Docket No. 27.] Defendant filed its Reply on March 18, 2021. [Docket No.

28.]

## III.    JURISDICTION

The Court exercises subject matter jurisdiction over this matter pursuant to the Class

Action Fairness Act of 2005 ("CAFA"), which provides that "district courts shall have

original jurisdiction of any civil action in which the matter in controversy exceeds the sum

or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any

6

member of a class of plaintiffs is a citizen of a State different from any defendant." 28

U.S.C. § 1332(d)(2). "[T]he claims of the individual class members shall be aggregated to

determine whether the matter in controversy exceeds the sum or value of $5,000,000,

exclusive of interest and costs." Id. § 1332(d)(6).

Here, Plaintiffs allege that the aggregate amount in controversy exceeds $5,000,000.

[Docket No. 10, ¶ 18.] They allege that they are citizens of New York, New Jersey, South

Carolina, and Connecticut. [Id.] Defendant is a citizen of New Jersey. [Id.] Therefore,

minimal diversity exists and the requisite amount in controversy is met, so the Court

exercises subject matter jurisdiction over this case pursuant to CAFA.

## IV.    LEGAL STANDARD

When considering a motion to dismiss for failure to state a claim upon which relief

can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all

well-pleaded allegations in the complaint as true and view them in the light most favorable

to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005). It is well-settled that a

pleading is sufficient if it contains "a short and plain statement of the claim showing that the

pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do . . . ." Bell Atl. Corp. v. Twombly, 550 U.S.

544, 555 (2007) (alteration in original) (citations omitted) (first citing Conley v. Gibson, 355

U.S. 41, 47 (1957); then citing <u>Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.</u>, 40 F.3d

247, 251 (7th Cir. 1994); and then citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court must take three steps.
> First, the court must "tak[e] note of the elements a plaintiff must plead to state
> a claim." Second, the court should identify allegations that, "because they are
> no more than conclusions, are not entitled to the assumption of truth." Third,
> "whe[n] there are well-pleaded factual allegations, a court should assume
> their veracity and then determine whether they plausibly give rise to an
> entitlement for relief."

<u>Malleus v. George</u>, 641 F.3d 560, 563 (3d Cir. 2011) (alterations in original) (citations

omitted) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 664, 675, 679 (2009)). A court may

"generally consider only the allegations contained in the complaint, exhibits attached to the

complaint and matters of public record." <u>Schmidt v. Skolas</u>, 770 F.3d 241, 249 (3d Cir.

2014) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192,

1196 (3d Cir. 1993)). Moreover, when a plaintiff's "own exhibits contradict her allegations

in the complaint, the exhibits control." <u>Corchheimer v. Philadelphian Owners Ass'n</u>, 903

F.3d 100, 112 (3d Cir. 2018).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the

claim." <u>Twombly</u>, 550 U.S. at 563 n.8 (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236

(1974)); <u>see also</u> <u>Iqbal</u>, 556 U.S. at 684 ("Our decision in <u>Twombly</u> expounded the pleading

standard for 'all civil actions' . . . ."); <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d

Cir. 2009) ("<u>Iqbal</u> . . . provides the final nail in the coffin for the 'no set of facts' standard

that applied to federal complaints before <u>Twombly</u>."). "A motion to dismiss should be

granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is

plausible on its face.'" <u>Malleus</u>, 641 F.3d at 563 (quoting <u>Twombly</u>, 550 U.S. at 570).

## V.   ANALYSIS

Defendant's Motion to Dismiss and Supplemental Brief argue that Plaintiffs'

Amended Complaint should be dismissed in its entirety. [<u>See</u> Docket Nos. 9, 20.] As is

discussed below, all of Plaintiffs' claims essentially turn on whether Defendant followed

through on the promises it made to Plaintiffs. Therefore, the Court will begin by analyzing

the parties' interpretations of what was promised. The Court will do so by considering the

Agreement itself, as compared to Plaintiffs' allegations in the Amended Complaint. <u>See</u>

<u>Vorchheimer</u>, 903 F.3d at 112 ("[I]f [the plaintiff's] own exhibits contradict her allegations

in the complaint, the exhibits control.").

The parties seemingly do not dispute that the Agreement guarantees that Defendant

will automatically review an account for graduation once the cardholder has maintained the

card for seven months without default. [<u>See</u> Docket No. 9-1, at 10; Docket No. 27, at 6.]

However, the parties dispute whether the Agreement guarantees anything beyond that.

Plaintiffs contend that the Agreement contains three more guarantees beyond the mere

promise to review. [<u>See</u> <u>id.</u>, at 5–6.] First, Plaintiffs argue that Defendant promises "to

release customer funds and issue a prorated refund if the review is successful," and that this

promise is false. [<u>Id.</u>, at 5 (cleaned up).] Second, Plaintiffs argue that Defendant promises to

automatically upgrade accounts "when the seven-months-without-default 'eligibility

requirement' is met." [<u>Id.</u> at 5–6.] And finally, they argue that Defendant promises to notify

9

customers who meet the requirements of their automatic graduation, which promise

Plaintiffs also claim is false. [Id. at 6.]

Defendant—rightfully—does not dispute that the Agreement guarantees notification

of automatic graduation and a prorated refund upon graduation. However, it does argue

that Plaintiffs' claim that the Agreement guarantees automatic graduation upon satisfaction

of the threshold requirements would require the Court to "read a promise into the contract

that is not there—a 'promise to upgrade accounts in seven months.'" [Docket No. 9-1, at 10

(quoting Docket No. 1, ¶ 9 (identical to Docket No. 10, ¶ 9)).] Defendant notes that the

Agreement does not promise automatic graduation after seven months without default. [Id.]

Rather, Defendant argues, the Agreement only states that a cardholder who maintains their

account for seven months without defaulting "may be eligible to graduate to an unsecured

TD Bank credit card automatically." [Id. at 9 (quoting Docket No. 10-1, at 2, § 3(C)).] The

only promise made by the Agreement is that Defendant will "automatically . . . review[]" a

cardholder's account for graduation once the cardholder "meet[s] the threshold eligibility

requirements"—that is, (1) maintaining the account for seven consecutive months (2)

without any acts of default. [See Docket No. 10-1, at 2, § 3(C).]

The Court finds that the Agreement makes the following relevant promises. First, the

Agreement guarantees that Defendant will automatically review accounts for graduation

after seven consecutive default-free months. [Docket No. 10-1, at 2, § 3(C) ("Your account

will automatically be reviewed once you meet the threshold eligibility requirements.").]

Second, the Agreement guarantees that Defendant will issue a prorated refund of the annual

10

fee when an account is graduated. [Id. ("Upon graduation, a prorated refund of the annual fee will be given to you and it will appear on a subsequent monthly statement.").] Third, the Agreement guarantees that Defendant will notify a cardholder who is eligible for graduation. [Id. ("If you meet the requirements you will be notified of the impending automatic graduation.").]

The Agreement does not, however, guarantee that Defendant will automatically graduate any account after seven consecutive default-free months. [See id. (contemplating automatically reviewing accounts that have been "maintain[ed] . . . for 7 consecutive Billing Cycles without committing an act of default," while also contemplating that some accounts will "not [be] graduated at [the] first review").] Although the Agreement does not specify what other factors will go into the decision to graduate an account, it clearly implies that there are requirements beyond simply maintaining the account for seven consecutive default-free months. [See id.] Therefore, the Court agrees with Defendant that Plaintiff's argument that the Agreement calls for the automatic graduation of any account that has been maintained for seven consecutive default-free months would require the Court to "read a promise into the contract that is not there." [See Docket No. 9-1, at 10.]

Here, only the promise to automatically review is truly relevant. The other two promises outlined above—notification of impending automatic graduation and automatic prorated refund upon graduation—are not relevant. After all, Plaintiffs have not alleged any facts to support the allegation that Defendant failed to refund prorated annual fees to any graduated accounts or failed to automatically notify anybody whose graduation was

imminent. These two promises only come into play when a cardholder has graduated to an unsecured credit card. Here, Plaintiffs readily admit that they have not been graduated. This is the entire thrust of their Amended Complaint. Therefore, those promises are irrelevant.

However, the promise to automatically review is relevant because Plaintiffs allege that Defendant failed to uphold that promise. The only evidence Plaintiffs point to in support of this allegation comes in the form of statements allegedly made by Defendant's customer service representatives that indicated that Defendant did not automatically review accounts after seven default-free months. [See Docket No. 10, ¶¶ 40–41, 83–85.][4] At this stage of litigation, the Court is obligated to accept those allegations as true. Therefore, the Court will assume that Defendant's customer service representatives made the alleged statements and that they were reflective of Defendant's true policy. As the Court briefly explains below, this allegation is the thread that keeps each of Plaintiffs' claims alive.

---

[4] The Court rejects Plaintiffs' reliance on a portion of Defendant's website that explains the process for a secured cardholder to apply for an unsecured card, as this has nothing to do with graduation, but rather describes an entirely different process by which secured cardholders can receive unsecured cards. [See Docket No. 10, ¶ 87; Docket No. 28, at 6–7.]

### A.    Count I

#### 1.    Breach of Contract

To state a claim for breach of contract under Delaware law,[5] Plaintiff must allege "(1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages." See, e.g., Partners & Simons, Inc. v. Sandbox Acquisitions, LLC, No. 2020-0776-MTZ, 2021 Del. Ch. LEXIS 169, at *11 (July 26, 2021) (quoting Wenske v. Blue Bell Creameries, Inc., No. 2017-0699-JRS, 2018 Del. Ch. LEXIS 221, at *20 (Del. Ch. July 6, 2018)). Only the second element is at issue here. [See Docket No. 9-1, at 8–11.] As explained above, Defendant promised to automatically review accounts that satisfied the threshold requirements, and Plaintiff adequately pled that Defendant breached that promise. Therefore, the breach of contract claim survives insofar as Plaintiffs adequately pled that Defendant did not automatically review Plaintiffs' accounts for graduation once they met the threshold requirements.

#### 2.    Breach of the Implied Covenant of Good Faith and Fair Dealing

In Delaware, every contract contains an implied covenant of good faith and fair dealing, which, "[s]tated in its most general terms, . . . requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." Dunlap

---

[5] The parties agree that Count I is governed by Delaware law pursuant to Section 2 of the Agreement. [See Docket No. 10-1, at 1, ¶ 2; Docket No. 9-1, at 8 n.4; Docket No. 27, at 5 n.1.]

v. State Farm Fire & Cas. Co., 878 A.2d 434, 441–42 (Del. 2005) (quoting Wilgus v. Salt

Pond Inv. Co., 498 A.2d 151, 159 (Del. Ch. 1985)). "In order to plead successfully a breach

of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific

implied contractual obligation, a breach of that obligation by the defendant, and resulting

damage to the plaintiff." Anderson v. Wachovia Mortg. Corp., 497 F. Supp. 2d 572, 581–82

(D. Del. 2007) (quoting Fitzgerald v. Cantor, No. 16297-NC, 1998 Del. Ch. LEXIS 212, at

*1 (Del. Ch. Nov. 10, 1998)).

> The Delaware Supreme Court 'has recognized the occasional necessity of
> implying contract terms to ensure the parties' reasonable expectations are
> fulfilled. This quasi-reformation, however, should be [a] rare and fact-
> intensive exercise, governed solely by issues of compelling fairness. Only
> when it is clear from the writing that the contracting parties would have
> agreed to proscribe the act later complained of . . . had they thought to
> negotiate with respect to that matter may a party invoke the covenant's
> protections.'"

Id. at 581 (quoting Wal-Mart, 901 A.2d at 116).

Here, Plaintiffs contend that the "'specific implied contractual obligation' is

[Defendant's] promise to automatically consider customers for an unsecured credit card

after seven months in good standing." [Docket No. 27, at 8.] Specifically, Plaintiffs argue

that Defendant "is obligated to actually consider customers for the upgrade in good faith,"

but that it fails to do so and "uses its discretion to deny graduation to all customers for at

least two years." Moreover, Delaware courts have held that "[w]hen a contract confers

discretion on one party, the implied covenant requires that the discretion be used reasonably

and in good faith." Airborne Health, Inc. v. Squid Soap, LP, 984 A.2d 126, 146–47 (Del.

Ch. Ct. 2009) (citing various cases). Plaintiffs argue that Defendant failed to exercise its

14

discretion reasonably in good faith, given that it "promis[ed] customers could graduate to unsecured status after seven months when in fact this was never [Defendant's] actual practice." [Docket No. 27, at 9.]

For the same reasons as set forth above—that is, Plaintiffs' allegations that, in essence, Defendant uniformly refused to graduate cardholders who satisfied the threshold requirements for graduation for two years, despite the Agreement stating that cardholders would be eligible for graduation after seven months—Plaintiffs have stated a claim for breach of the implied covenant of good faith and fair dealing. Therefore, Defendant's Motion will be denied in that respect.

### B.     Statutory Claims (Counts II–V)

Plaintiffs bring their remaining claims under various state consumer fraud statutes. [Docket No. 10, ¶¶ 116–59.] While each statute is slightly different, they all require a plaintiff to plead essentially the same elements: (1) wrongful (i.e., misleading or fraudulent) conduct by the defendant; (2) loss by the plaintiff; and (3) causation between the conduct and the loss.[6] Defendant first argues that Plaintiffs fail to plead that it committed any

---

[6] The Delaware Consumer Fraud Act (Count II) prohibits the use of "any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise." 6 DEL. C. § 2513(a). "[T]o bring a private cause of action for damages under the [DCFA], a plaintiff must allege three elements: (1) a defendant engaged in conduct which violated the statute; (2) the plaintiff was a 'victim' of the unlawful conduct; and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's

15

wrongful conduct because Plaintiffs "misread[] . . . the contract language to supposedly

promise or represent that automatic <u>graduation</u> shall occur upon seven consecutive months

of default-free use of their secured credit cards." [Docket No. 9-1, at 13; <u>see</u> Docket No. 20,

at 4 (CUTPA claim).] While it is true, as the Court noted above, that Plaintiffs' Amended

Complaint mistakenly reads such a guarantee into the Agreement, Defendant's argument

ignores the allegations that Defendant's employees told customers that review would not

actually happen until after two years, instead of seven months as promised by the

---

ascertainable loss." <u>Teamsters Local 237 Welfare Fund v. Astrazeneca Pharms. LP</u>, 136 A.3d 688, 693 (Del. 2016).

New York's Section 349 (Count III) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GEN. BUS. LAW § 349(a). To state a claim under Section 349, "a plaintiff 'must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act.'" <u>Crawford v. Franklin Mgmt. Corp.</u>, 758 F.3d 473, 490 (2d Cir. 2014) (quoting <u>Stutman v. Chem. Bank</u>, 95 N.Y. 2d 24, 29 (2000)).

The New Jersey Consumer Fraud Act (Count IV) prohibits "unlawful practice[s]" that include in relevant part "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J.S.A. § 56:8-2. To state a claim under the NJCFA, a plaintiff must demonstrate "(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal connection between the unlawful conduct and the ascertainable loss." <u>Bosland v. Warnock Dodge, Inc.</u>, 197 N.J. 543, 557 (2009) (cleaned up).

The Connecticut Unfair Trade Practices Act (Count V) "broadly prohibits 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' . . . [It] establishes a private cause of action, available to '[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b.'" <u>Marinos v. Poirot</u>, 308 Conn. 706, 712–13 (2013) (quoting CONN. GEN. STAT. § 42-110g(a)).

16

Agreement. Defendant's arguments about some of Plaintiffs' other allegations are well-taken by this Court. [See id., at 13–17.] However, as the Court explained above, the allegations regarding the timing of automatic review adequately support Plaintiffs' claims at this stage. Assuming, as the Court must, the veracity of Plaintiffs' allegations, Defendant engaged in wrongful conduct when it promised Plaintiffs that their accounts would be automatically reviewed for graduation after seven months, only to not actually do so for two years. Defendant makes no argument that Plaintiffs failed to satisfy an any of the statutes' other elements—generally, that Plaintiffs suffered losses because of Defendant's wrongful conduct. Therefore, Plaintiffs have adequately stated claims under the state statutes.

Alternatively, Defendant argues that Plaintiffs' DCFA claim should be dismissed because "the DCFA applies only to representations about 'merchandise,' and credit cards to not qualify as 'merchandise'" because "[t]he statute defines 'merchandise' as 'any objects, ware, goods, commodities, intangibles, real estate or services.'" [Id., at 17 (quoting 6 DEL. C. § 2511(6)). This, Defendant argues, does not extend to lines of credit. [Id.] The Court disagrees with this argument. Defendant offers no authority that has interpreted the DCFA to exclude the extension of credit from its purview. [See id.] Moreover, the DCFA explicitly states that its "purpose . . . shall be to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State" and that it "shall be liberally construed and applied to promote its underlying purposes and policies." 6 DEL. C. § 2512. Therefore, this Court holds

17

that the DCFA applies to the extension of credit. Plaintiffs' DCFA claim will not be

dismissed based on Defendant's argument to the contrary.[7]

## VI.    CONCLUSION

For the foregoing reasons, the Court will deny Defendant's Motion to Dismiss. An

accompanying Order shall issue.


August 18, 2021                                      s/Renée Marie Bumb
Date                                                 RENÉE MARIE BUMB
                                                     United States District Judge

---

[7] Defendant also points out that "claims under the NJCFA and the DCFA are subject to the heightened [p]leading standard of Rule 9(b), which requires that fraud claims be pleaded with particularity." [Docket No. 9-1, at 13 (citing cases).] However, presumably because of the thoroughness of the Amended Complaint, Defendant makes no argument that Plaintiffs fail to meet that pleading standard here. Therefore, the Court need not address this issue.

18